The next case today is number 231361, Public Interest Legal Foundation, Inc. v. Shanna Bellows. Will the attorney for the appellant please step up to the podium and introduce yourself for the record? Good morning, Your Honors. My name is Jonathan Bolton. I'm an Assistant Attorney General representing the Secretary of State, Shanna Bellows. And if I may, I'd like to reserve two minutes for rebuttal. You may. Thank you. So may you proceed. May it please the Court. This appeal is not about whether the plaintiff in this case can get Maine's voter file. Maine's Exception J allows plaintiff to purchase a copy of the voter file right now if it wants to. The case is also not about whether the plaintiff can analyze the voter file, whether they can issue reports about the voter file, whether they can talk to public officials about the voter file, whether they can bring enforcement actions about the voter file. Exception J, the state law at issue here, is not meant to prohibit any of those things. And we have made clear in our brief and in affidavits that plaintiff is free to do all of those activities. The only question properly before the Court is whether plaintiff has a right to make available to the general public through the Internet or by other means personally identifying information about individual Maine voters contained in the voter file. Does it have a federal right, not just to evaluate and publicly criticize maintenance practices, which we agree that it does, but to include in its published reports individual voter names, their resident addresses, their party affiliations, the elections they voted in, and other private information derived from Maine's Confidential Central Registration Database? Counsel, may I ask you a question? I understand your argument that the voter file is not a covered record under the NVRA, and you think it's a narrow class of records that are covered. So the question I want to ask you is, say we agreed with your interpretation and it was a narrow class of records that could be obtained, but it seems that you agree that that narrow class of records would include documents showing voters whose names were taken off the rolls, for example. Wouldn't those records also have personally identifiable information, and if they're certainly covered by the NVRA, couldn't they be posted on the Internet? So I'm just trying to understand, practically, what is the difference? Because it seems like, even under your interpretation, they would be able to post private information about voters. Sure. So there is a category of records under the NVRA that everyone agrees is public, which is the list of all the people that have received D2 postcards and their mailing addresses. So that certainly is a subcategory of private voter information that the NVRA clearly says can be made public. And wouldn't that include, or maybe you can tell me, what would that include? Would it include party affiliation? It does not include any of that information. Does it include information about when they last voted? It's name, their name, their address, and I think their response, if any, to the postcard that was mailed to them. So it's a narrow class of information. That information is kept by the Secretary of State. That's available for public inspection. But that is a much narrower, so that's only, it's a limited amount of private information, and it only relates directly to what the purposes of the statute are, which is to allow the to maintain their lists, and that information is directly relevant. So what we're talking about here is a much, much broader compilation of more information about more people, 1.1 million records. So are you saying that's the only, those are the only records that they would be entitled to under the NVRA? That's the only records of the programs and activities that the state undergoes to check the currency and accuracy of the rolls, or are there other records as well? Well, Your Honor, I think anything that the Secretary, so that we've shown the record in our Statement of Material Facts, starting at paragraph 60. There are periodic efforts that are done every couple of years. We've done six, I think, since 2007 to maintain the voter rolls, and all the documentation relating to that. I mean, there could be exceptions. I mean, we might have to fight about, you know, some specific exception under federal law. I completely understand. I'm just wondering if you can tell us what kind of personal information would be involved in the entire set of records that even you agree would be required to be disclosed. Sure. I think it would be the personal information that's required under I2, which we just talked about. And then I think if there were other records that were, you know, specifically discussed and there's memorialization of that and records of the Secretary of State as they're going through these efforts, then potentially those, that information would be available as well. I mean, the statute is meant to cover what the state is doing when it's doing these maintenance, in our view, doing these list maintenance efforts. And will that include more of the names and addresses? That's what I'm just trying to get a sense of. If you don't know, it's okay. I mean, I think it would depend on what actually happened in a particular, you know, whether a particular records were discussed, whether there are, you know, emails going back and forth, whether the records would be, you know, that sort of thing. But if it's covered, if, you know, if in fact there have been, you know, particular records that have become part of that file of that particular maintenance effort, then they'd be covered. But I can't tell you what the specific record would be for any particular, you know, maintenance that was done. It would really depend on what was done and what the election officials did in that particular maintenance effort. Let me ask you a different question. I know that from the perspective of the Secretary of State and the Attorney General, you mentioned that your interpretation or you're not going to enforce Exception J. Is that correct? That's correct. Yeah. We're not going to enforce the use restrictions in the way that the plaintiff claims to fear that we're going to. Okay. Now, the concern, and this has been raised, I believe, by opposing counsel and I believe maybe the United States, the issue is that that interpretation is not binding on a future administration or tomorrow the Secretary of State or Attorney General could say we're going to do it the other way around. So and this goes also to the United States' request for certification. Isn't it something we should perhaps certify the Maine Supreme Court to determine with finality because if the Maine Supreme Court says, yeah, it doesn't apply this way, it's not going to, then we know exactly and then we might not have to rule on that. So do you have anything to say about that? Well, I think this court in the National Organization for Marriage case that we cited has taken the representations of the Attorney General in briefs to this court as authoritative in terms of how the Attorney General intends to interpret a statute. And I'd also just point out from a, just from sort of a common sense practical point of view, that it would analyze the voter file, that it would issue a report about, you know, critical of Maine, that we would take no enforcement action, but as soon as it did the same thing but used Maine data to issue a report about, say, Massachusetts' voter file, that somehow we would jump into action and bring a civil enforcement action based on that. And I don't think that makes, just from a common sense perspective, that doesn't seem, there has to be an eminent threat of prosecution and that's not something we will do as we've represented in our briefs and it's sort of beggar's belief that any future official would do that. But could an electoral cycle, new Attorney General, new Secretary of State, they think otherwise. Wouldn't that be an issue? I think it's, well, first of all, I think it raises, you know, we've raised the standing issue and is it really ripe now? That's what I was going to say. If there's a chance that some years in the future that this might happen, and particularly, again, where I think it's so unlikely that anything like that would happen, it clearly, the legislature's purpose here was to allow this type of evaluation of voter lists and, you know, the statute, you know, we've been in our brief, it could have been worded better, but the purpose is to allow this to happen. How do you claim that's capable of repetition yet evading review if we don't address it now? I don't see how it would evade review, Your Honor. I mean, I think if there were, you know, some change, I would think there would be ample time to, in a more realistic threat of enforcement in the future, which, again, I think is highly unlikely, there'd be time. But, Counsel, isn't the challenge that your interpretation is contrary to the plain language of the statute, which says the state, capital S, not a state? And, you know, we have a statute that has pretty significant penalties, fines attached to it. And, you know, generally, we're supposed to assume the legislature means what it says. I appreciate your argument that it wouldn't be practical for you to do what is being alleged, but that's not what we're really deciding. We're looking at what the statute would permit someone to do. And I'm just wondering if you have a case that indicates, because my understanding of the law is when you have a recent statute like we do here, especially it's been amended, and it has substantial fines that just statements by state officials that they're not going to enforce it is not enough to eliminate standing. So I'm just curious if you have a case that's actually squarely on point that would say that it is. Well, again, I think the National Organization for Marriage case involved representations made by our office in briefing, not sworn, not an affidavit. It's just in briefing. And this court accepted that as an authoritative interpretation of the statute for purposes of the constitutional claims that were issued. For standing? Was it about standing, though, to challenge something? No, it was about whether the statute would be, potentially could be enforced in a way that was unconstitutional. And we offered a narrower interpretation, which this court accepted. But was it contrary to the plain text of the statute? Well, no, Your Honor. But I would argue that this is not, would not be contrary to the plain text. I understand, but just the facts of that case, there was no, the court did not say, we're going to accept your interpretation, even though we think it is contrary to the plain text of the statute, correct? No, yes, that's correct, Your Honor. But we don't think this is contrary to the plain text of the statute. You know, I point out that the court below, in the initial proceedings on the motion to dismiss, suggested that this interpretation that we're putting forward in a capacious reading of the statute might be permissible. So, you know, I think, you know, it does say the state, that could be interpreted to mean sort of the target state of the list maintenance evaluation that's occurring. And it also has language about it has to be a purpose directly related to the evaluation of the state's list maintenance purposes. And there could be, I think there is an argument that if all this happens together, it's all connected. If you're evaluating Maine's list and evaluating another state's list, you're evaluating both together. And so it would be a directly related purpose. So, and the other two things I just point out is there is deference that it's given in state courts and interpretation of the Secretary of State where she interprets this. She's in charge of enforcing a statute together with our office. And in addition, I think it might be looked at as a public records access provision, in which case those are also given narrow interpretations by the state court. So those would all be reasons that I think our interpretation is one that would succeed in state court. Let me ask you, to the extent you know, are there any other states that have any legislation similar to yours? And has it been challenged? Your Honor, there are actually, I think EPIC's amicus brief talks about this quite a bit. There are many states that have restrictions on the dissemination and use of the voter file. I think ours is probably somewhat unique in that I'm not sure that I've seen another one that's quite like ours. But I will say that, for instance, I believe California prohibits posting of voter file data to the Internet, which is one, I think, very important component of our law. And I think there are other states that have similar restrictions like that. And certainly many, many states, I think almost all ban commercial use of the voter file. And I don't think commercial use is not being challenged here. I'm sorry? Commercial use is not being challenged. That's not an issue in this case. That's correct. But there are states that do prohibit posting on the Internet, Your Honor. OK. Thank you. And you have reserved your rebuttal time. Thank you. Let's hear then from Mr. Johnson for Public Interest Legal Foundation. May it please the Court. My name is Noel Johnson. I'm here on behalf of the Eppley Public Interest Legal Foundation. Congress believed that accurate voter rolls were so vital to the proper functioning of a democracy that it made all records subject to public disclosure when it comes to voterless maintenance and registration. Maine is thwarting Congress's objectives and punishing and silencing its critics. Now, counsel mentioned that there's only one question in this case, but that's not accurate. Maine is challenging the threshold issue that the voter file is within the scope of the NBRA. And I think that's an easy question. Every court to have addressed that question has answered that question, yes. And that's because the words of the statute compel that answer. In the simplest terms, Maine's voter file is the end product of all of Maine's voterless maintenance activities. Congress used the word concerns in the statute and Maine's voter file squarely concerns its list maintenance activities. Congress considered exceptions to this law. They're found in Section 8I. There's only two of them. Neither of them apply here. Otherwise, Congress mandated complete transparency when it comes to list maintenance records. We fully agree with the United States that disclosure of the voter file would further all of the NBRA's purposes. The district court's conclusion is faithful to the text of the statute, and the district court committed no errors when it read the statute to mean what it says. Where do you stand on the certification question? I was going to ask that same question. Sure. I second that. This is not a complex statute. There's no uncertainty. There's no ambiguity. The Maine legislature drafted with precision. It chose its words carefully. It said the state. There's only one state that matters here. It's Maine. And when it comes to enforcement, counsel mentioned that it's common sense to assume that they would not enforce a statute that they've promised not to enforce. I think it's common sense to read the statute to mean what it says. That's what controls in this case, the text of the statute. The statute says the state. Maine took the position at the motion to dismiss stage of this case that our activities cross-state evaluation was prohibited. They have changed their mind about what the statute means in this case. At summary judgment, they changed their mind and said, now it means every state. But they're asking us to take the risk that they won't change their mind later. So there's, as a standing, there's, from your perspective, there's no issue as to that. We can decide the case without, and there's no necessity to certify, correct? Correct. This court does not need to certify that question because the statutory text is clear. But we could certify as the United States has, you know, we have that discretion. Yes. Counsel, what about the substantial privacy interests of voters, which the United States says states can take steps to protect? Taking the information of 1.1 million voters and putting it on the internet, obviously is going to expose private information of a lot of people. What is your response to that? Well, Congress considered and decided that issue when it wrote in the statute that all records related to list maintenance are public. And. But it provided for inspection and photocopying, which seems different than posting it on the internet to me. It does. And I think we would agree with the United States that it comes down to what is the purpose of your action? And we're not challenging Maine's ability to prohibit the sale of this information for commercial purposes, to prohibit voter intimidation. What Maine cannot do is prevent uses that are consistent and which further Congress's objectives. And there are four in this case. And we agree with the United States that if use of the voter file dissemination furthers those purposes, then Maine can't prohibit them. Maine cannot prohibit what Congress intends. So your argument is you have to get the voter file. And then I'm not saying your organization would do this, but if somebody used the information to intimidate voters, then Maine, after the fact, could. Certainly. Enforce its anti-voter intimidation laws. But it has to give you the information before it can do that. And wait to see if anybody misuses it. Certainly. And I think that's compelled by the text of the NVRA that all records must be disclosed. So I would agree. They must give out these records first. That's what federal law requires. And just to be clear, nothing in this case will disturb voter intimidation laws, anti-commercial use provisions, or anything similar to that. The record shows that my client intends to use this data for purposes consistent with the NVRA. And those are the uses that Maine cannot prohibit. And I think about one example on why bans on speech and dissemination can harm the right to vote is found in the Fourth Circuit's decision in Project Vote. There, the plaintiffs sought copies of rejected applications submitted by students at a historically black college. If Virginia had a dissemination ban, it would have been illegal for Project Vote to share those students' names with a broader audience to help get them re-registered. It would have been illegal to publish copies of the registration forms to show that the registrar acted unlawfully. And we know that's not the outcome Congress intended here because Congress wrote its findings in the NVRA. Congress found that discriminatory registration laws have a damaging effect on voter participation. And any state law that prevents the public from speaking about those damaging effects is contrary to Congress's intent. And I would say with respect to the fines, because each of these, the use ban, the dissemination ban are preempted and unenforceable, the fines must be too. I think the district court also got that correct. Let me ask you, and I'm referring specifically to page 57 of the appellant's brief. And the state has, the concern in enacting the statute as informed is that Exception J furthers the important federal policy of preventing voter intimidation. So you're not in agreement with that, right? You disagree with that? Sorry, can you repeat the statement? This is, again, page 57 of the appellant's brief. Exception J furthers the important federal policy of preventing voter intimidation. What's your reaction to that? Well, in some instances it may, and we're not challenging their ability to prohibit voter intimidation. If somebody were to take the voter file, put it online with the intent to intimidate, that's something Maine could prohibit. I think the circuit's precedent says that it does not immunize a statute from challenge or preemption if it furthers some of Congress's objectives, but conflicts with others. So if that's the finding here, if that's the argument Maine is making, that this furthers some objectives, if it prevents and obstructs other objectives, it is still preempted, and that's the case we have here. I think a lot of important work has been done in the Project Vote case, and in cases since then. Congress designed the NVRA to make voter registration and list maintenance transparent, and Maine is thwarting Congress's design. They are preventing criticism and speech, and for these reasons that we ask you to affirm the decision below. Okay, thank you. Let's hear now from Amicus United States, Mr. Bocat. Thank you, Your Honor. May it please the Court, Noah Bocat-Lindell for the United States. I want to make sure to get to the certification issues that you've asked about and about the preemption issues, but I'd just like to start with a couple of points on this threshold question of whether Maine's voter file is subject to disclosure under Section 8I because this is an issue of extreme importance to the United States. So first of all, Section 8I, as the Pills Council stated, includes specific exceptions of records that might otherwise be included but are being excluded for particular reasons. And those exceptions are things related to voter registration, not just to list maintenance activities, much less the limited set of required list maintenance activities that Maine suggests are the only things that Section 8I covers. So those exceptions are declinations to register, records related to those, and records of what public agency someone registered via. Those records would have, there would be no reason for Congress to have exempted those records from Section 8I if Section 8I didn't otherwise cover voter registration activities. And as far as I could tell from reviewing Maine's briefs, at no point does Maine address these exceptions or what they are doing there if Maine's view of Section 8I's scope were the correct one. This would create a huge surplusage problem with the statute. I'd also note that disclosure of records under Section 8I is extremely important for list maintenance activities of the sort that PILF has been discussing, but it's also crucial to voter registration activities. The Project Vote case that has been discussed already is one example of that, where Project Vote was seeking applications, completed applications of people at a historically black college who were concerned were being improperly denied registration. There is another case pending before the 11th Circuit right now where Greater Birmingham Ministries, an organization that attempts to re-register voters who had committed felonies that under recent Alabama laws are now eligible for restoration of their voter rights to be able to reach out to those voters and get them re-registered. They cannot do these things without the voter file, because the voter file is the list of everyone who is currently registered to vote, and without that you can't determine who's not registered. In theory, you also need the address, because if you can have Steve Bellows and you don't know where he lives or he moved, then that's why you need... That's right, exactly. This is incredibly important to voter registration organizations. It also fits squarely within the text of the statute, because in order to determine how states are implementing all of these programs and activities that Congress created in the NVRA and that they later added to in the Help America Vote Act, it is absolutely necessary for people to be able to see the results of that implementation. You can't simply take a state at its word that it is implementing all of these policies in a non-discriminatory manner and that it is complying with all the other requirements. You need to see how it results. Counsel, can I ask you just a practical question? I think you in your brief said that it would certainly be fine for a state to redact extremely sensitive information, like a social security number, for example. Do you think that any of the categories of information that Maine's voter file includes based on the briefing would be appropriate for redaction? So I have to go back and look. It's possible that, for example, it talks about a voter's birth date. If that includes the day and month of birth, it's possible that that might be something that could be redacted. But in general, the redactions are things that are tied to other federal statutes that mandate disclosure. And there, where there's a specific mandate to withhold particular information from a file, the general disclosure requirement of the MPRA yields to those specific statutes. And if I'm not mistaken, the Maine statute does not have any guidance as to what redaction would occur. Again, there may be specific social security. In the court, we redact that. There may be other sensitive information. But that's really on a case-by-case basis. But there's no guidance from the state. That's right. That's right, Your Honor. But is the position of the United States, for your purposes, that the MVRA requires the disclosure of the full voter file and the only information that should be redacted is information that other federal laws indicate needs to be protected? Is that what you're arguing? Or is there an additional category of information that states have discretion to decide whether it's sensitive? I'm just curious which position. Sure. So the only additional category of information are things that the courts have recognized, have a particularly strong reason for redaction. So, yeah. I'll continue and then answer the other question once you're done with that answer. Thank you very much. So in the North Carolina, Pilfer's North Carolina case, the court noted that there is a compelling interest in protecting the privacy of people who are under criminal investigation but were later exonerated. That's something that can be withheld even if it falls outside of the specific federal rule of criminal procedure related to grand jury information. But generally speaking, most things would be covered by another federal law. One other place where a state might be able to withhold information are address removal programs for people who are subject to domestic violence, for example, where they have a particular interest beyond that of the overall population and having their name and address. But right now, as the state statute stands, it doesn't provide for that. So there's like, it would have to amend it to cover it or say, pursuant to federal law. That's right, Your Honor. If I can just quickly address certification. So the secretary is relying mainly on, or excuse me, principally on their own interpretation of the law. But as this court noted two years ago in the NCTA case, Maine is a state where the attorney general's interpretation of law is not binding on the Maine courts or on local law enforcement. And so we generally just don't adopt that provision, particularly given the federalism concerns here with the federal court just adopting a narrowing construction of a law in order to avoid constitutional problems. Instead, as the Supreme Court has said, usually the best way to go is to certify to the state Supreme Court. And that's why we suggested that in our brief. Let me ask you, would the state Supreme Court, I don't know if you checked the jurisprudence, or the high court, as it's called, what if that court would say, well, we defer to the attorney general or the secretary, then we're back in square one here? Well, I think if the Maine Supreme Court just completely deferred to the interpretation of the attorney general and the secretary, that would at least create a binding ruling of the state Supreme Court. But as long as the court, if the court said, we're just going to defer to them for now, and then they're free to change their mind, then we're in a, we're back in state. That's what I'm concerned. Because right now, but we have election cycles, and you could have somebody, and again, in my prior experience, I've had cases of the last public policy case for years, new federal government comes in, new state government comes in, they change their policy, and they were back to square one. So that's my concern. Sure. I think that I don't know what the odds are that the Maine Supreme Judicial Court would just say, we will defer to you for now, as opposed to, given that this is your interpretation you have put before the court, we will agree with you and hold that this is what the statute means. So I think if it does the latter, then that is a binding interpretation that we can all. Maine could say it has to be consonant with federal law and make it clear. Right, yes. And if it said it needs to be consistent with federal law, and therefore, we wouldn't have to worry about this preemption concern to the extent that the state law would interfere with the purposes of the federal law. And let me ask just another question. I assume that if we certify to the Maine, the high court, the United States Attorney General could also file amicus in that case. There's no impediment for that, right? There's no impediment to that, no. We'd have to go through the process of determining whether to file at that point. Given that it would be an interpretation of state law, but it would have federal law implications, we'd have to go through that process. OK, thank you. Any other questions before? OK. OK, rebuttal, two minutes. Thank you, Your Honor. I want to just touch on the two exceptions that counsel just mentioned in the text of subsection I-1. And Congress certainly had a great deal of concern about keeping declinations of to register to vote confidential and where people register to vote confidential. I think that's why they appear separately in the statute our position is that the voter file just isn't covered in the main part of the statute, so there would be no reason to have an exception. But the other point there is it certainly could come up in those types of that type of information could certainly appear in programs or activities to ensure the accuracy or currency of voter lists. There could be a situation in which the Secretary of State is concerned that a public assistant agency is not complying with the NVRA, is not timely sending in voter registration applications, and there could be an investigation into that. And then all of those types of documents could become swept up within the public disclosure provision under our interpretation. So I think there most certainly could be situations in which those records would be subject to the main provision under our interpretation. But counsel, and I know you focused on the word implementation. That was part of your argument. I just, isn't the ultimate voter file the end result of the implementation efforts? And how can you assess the implementation efforts if you don't know what's in the final product? Well, I think you certainly can assess the efforts because you'll be able to get all of the records of the actual process, what the state's policies are, how it was going about doing its maintenance program. So there's the list of who received the postcard. So there'd be other information that you would be able to get that would show implementation of the program. The question is, how expansively do we read this? And does it cover everything, or does it cover a narrow subset? And the way it's worded, there's so many limiting terms in the statute that we believe it does not cover everything relating to voter registration. OK. Any further questions? Yeah. OK. Well, thank you very much. You've all been very helpful. Excellent briefing. And I also want to thank the amici who have not argued today. There's other amici in the case. And safe travel, I guess, respectfully to Virginia, DC, and Maine. OK. Court is adjourned.